11 Chief Judge WILLIAM H. BYRNES III.
STATEMENT OF THE CASE:
On October 29, 1998, the defendant, Ronnie R. Moran, was indicted for aggravated rape of a child under the age of twelve in violation of La. R.S. 14:42. The defendant entered a plea of not guilty to the charge at his arraignment on December 4, 1998. A jury trial took place on October 5-6,1999. However, a mistrial was declared after the jury could not reach a verdict. A subsequent jury trial took place on October 10-11, 2000. The defendant was found guilty as charged. On October 26, 2000, the defendant filed a motion for new trial that was denied by the trial court. The defendant waived legal delays and was sentenced to life imprisonment at hard labor without benefit of probation, parole or suspension of sentence. Defendant’s motion for appeal was granted and a return date of December 26, 2000 was set.

STATEMENT OF THE FACTS:

Sgt. Perla Gibbs responded to a call from Children’s Hospital on October 14, *1175 1996, regarding a case of possible child abuse. The officer spoke with Dr. Benton who informed the officer that a seven-year-old girl (hereinafter referred to as W.C.)[1] was admitted to the hospital with ^complaints of pain to the left shoulder. Sgt. Gibbs interviewed the victim and her treating physician. After determining that a crime had been committed, the officer developed a suspect, namely the defendant, who was the victim’s cousin’s boyfriend. An arrest warrant was obtained for the defendant. The officer was later informed of the defendant’s arrest. The hospital tests revealed that the child had gonorrhea.
Dr. Scott Benton is the director of pediatric forensic medicine at Children’s Hospital. He examined the victim, W.C., in October of 1996. Dr. Benton testified that the child initially complained of a sore throat which then progressed to arthritis or inflammation of the shoulder joint. The child’s shoulder was very inflamed. At the time Dr. Benton was called in, a rheuma-tologist was treating the child. The initial diagnosis was rheumatoid arthritis. An orthopedist also examined the child. The orthopedist performed a surgical procedure in which fluid was taken from the shoulder joint. Testing of the fluid revealed that the child had gonorrhea. Once the gonorrhea was diagnosed, the child admitted that someone named “Ronnie” had abused her.
Dr. Benton performed a physical examination of the victim, including a gynecological examination of the victim. The examination revealed that the child had suffered trauma to the vaginal area. Dr. Benton opined that the results of the examination corroborated the victim’s statements concerning sexual abuse by “Ronnie.” Dr. Benton examined the victim again on December 4,1996.
Dr. Lloyd Gueringer, Jr., an emergency room physician at Methodist Hospital, treated C. S., the victim’s cousin, on September 4, 1996. C.S. presented herself at the emergency room complaining of abdominal pain. After examining C. S., Dr. Gueringer concluded that she had acute | aabdominal pain secondary to pelvic inflammatory disease. The likely cause of the “p.i.d.” was either Chlamydia or gonorrhea. Tests were not conducted to determine which disease was the cause of the “p.i.d.” The witness stated that he prescribed antibiotics for treatment.
Dr. Richard DiCarlo, an expert in internal medicine and infectious disease, testified that he reviewed the victim’s medical records. He stated that the victim had a disseminated gonococcal infection. Such infections are rare. Dr. DiCarlo stated that while’ gonorrhea is initially acquired through sexual contact, the bacteria could migrate to the blood and joints. The witness also examined C.S .’s medical records from Methodist Hospital. Dr. DiCarlo stated that since C.S. was diagnosed with a p.i.d., which is usually caused by gonorrhea or Chlamydia, there was a good chance that C.S. had gonorrhea in September of 1996. Dr. DiCarlo further testified that he reviewed the defendant’s medical records from Tulane Medical Center. These records indicate that the defendant was treated for urethritis in June of 1995. Urethritis is caused by gonorrhea or Chlamydia. The witness also reviewed the defendant’s sick call records while he was in jail. On November 8 and 21, 1996, the defendant was diagnosed with either urethritis or *1176 prostratis. Both are infections caused by a sexually transmitted disease.
T.C., the victim’s mother, testified that in October of 1996, she took the victim, W. C., to Ochsner Hospital’s emergency room when the victim complained of her throat and arm hurting. The victim was diagnosed with a sore throat and sent home. Two days later, T.C. took her daughter to Children’s Hospital with complaints of a stiff arm and high fever. T.C. testified that W.C. was diagnosed with gonorrhea. The child was in the hospital for two weeks. At first, W.C. would not talk to the physicians. She eventually told the witness and the physicians who had molested her. T.C. | ¿stated that the defendant was her cousin’s boyfriend and that her cousin and the defendant lived with them for several months. She identified the defendant in court.
C.S., the victim’s cousin and defendant’s girlfriend, testified that she has known the defendant for four and one-half years. She met the defendant in July or August of 1995. C.S. testified that she and the defendant lived in defendant’s van in her aunt’s driveway for a few months. She also acknowledged that the defendant had struck her and her daughter. C.S. admitted that she was a recovering drug addict and had been treated for abdominal pain in September of 1996 at Methodist Hospital.
S.C., the victim’s grandmother, testified that in August of 1995, she, T.C. and T.C.’s children, lived on General Ogden Street. The defendant and C.S. also lived with them for two months. S.C. stated that she remembered the night W.C. was taken to Children’s Hospital. The child stated that her legs were hurting and her arm was stiff. T.C. took W.C. to the hospital. S.C. testified that while W.C. was in the hospital, the defendant asked S.C., on several occasions, if W.C. ever talked to S.C. about “anything.” However, the defendant never asked about W.C.’s condition.
W.C., the victim, testified that the defendant, her cousin’s boyfriend, sexually molested her on several occasions between August of 1995 and September of 1996. She stated that she was six years old when she first met the defendant. W.C. stated that the first instance occurred at her grandmother’s house while defendant and her cousin lived with them. W.C. had awakened in the middle of the night and went into the kitchen. She was making a sandwich when the defendant walked into the kitchen. After the defendant sexually molested her, he told her that if she said anything he would take her into the woods and kill her. The next instance occurred in |Bthe shed behind her grandmother’s house. The third incident occurred at her aunt’s house. The defendant also molested the victim in his van. Another incident occurred at the victim’s house on North Robertson. W.C. testified that she never told her mother or grandmother because the defendant had threatened to kill her. She did not tell anyone until she was in Children’s Hospital. W.C. identified the defendant in court as the person who raped and molested her.
Pastor Willie Breaux testified that the defendant was a deacon in his church, Christian Fellowship Cathedral. He stated that the defendant was well mannered and a man of good moral standards.
Willdina Moran, the defendant’s wife, testified that she and the defendant married in 1979 and separated in 1996. She and the defendant have two children together. He was a good father to their children. At the time of the alleged incidents, she and the defendant were separated.
The defendant, Ronnie Moran, testified on his own behalf. He denied raping and/or molesting the victim. He stated *1177 that he was a member of two churches and worked with the youth of both churches. He testified that he had an argument with the victim’s mother about the renovation work he performed on her house on North Robertson.

ERRORS PATENT:

A review of the record for errors patent reveals none.

ASSIGNMENT OF ERROR NUMBER ONE

In his sole assignment of error, the defendant contends that the trial court violated his right against double jeopardy when it declared a mistrial and then reversed itself and continued with trial.
The incident occurred during defendant’s cross-examination of Dr. Scott Benton. The physician had been questioned about the abnormalities | fifound during the victim’s physical examination. In order to help the jury understand the difference between the victim’s abnormalities and the norm for young girls her age, the witness produced photographs of two black young girls’ sexual organs.
Therefore, how could you say whether or not W.C.’s vagina was not abnormal prior to your taking the photographs or was not the result of a birth defect?
I since (sic) two questions. The first relative to birth defect. I’m not aware of any birth defect that would cause the particular findings. I do recognize that in that question it is possible she could have looked like that from birth and that’s the reason this is not a definitive category of classification. The second half of it, this is an abnormality. I mean, you can take a hundred girls of her age and none of them or one of them maybe will look like this particular exam. So, it’s definitively abnormal.
Is it possible, doctor, that the abnormality could be from birth?
Is it possible that she was born looking like this? Yes. But it is a remote possibility.
So, when you are comparing photographs that you just picked of some black girl and you tried to tell the jury that that’s consistent with the way all black girls should look, that’s not exactly accurate, is it, doctor?
No, it is. Look, and let me give you— All black folks look alike?
THE STATE:
Objection, Your Honor.
THE WITNESS:
Let me answer the question, please. Let me give you an example
THE COURT:
Mr. Belfield, look over here at me. This is your last warning.
THE DEFENSE:
Your Honor, I move for a mistrial.
THE COURT:
This is your last warning.
HTHE DEFENSE:
I move for a mistrial.
THE COURT:
Motion denied.
THE DEFENSE:
Thank you. Note my objection.
THE COURT:
Ladies and gentlemen, disregard Mr. Belfield’s last remark. Proceed.
THE WITNESS:
The best example, it applies very well to this is, people’s height, and you can pick a race if you want but let’s just stick with people in general.
THE DEFENSE:
Objection, Your Honor. This is — that has nothing to do with the question I asked.
*1178 THE COURT:
Overruled.
THE WITNESS:
We know that the average man or average girl has a certain height and you know when you meet someone you say, wow, that person is tall or that person is short. Well, we do the same thing in science. We statistically look at where everybody fits. Are they taller or are they short. And we do the same thing with the hymen. Is it a tall hymen or is it a short hymen? The reality for the hymen however, is for the majority of black females, white females, it’s actually the same, have a certain height to it. That’s been measured repetitiously. I don’t like to use numbers but the pictures I showed you represent what the vast majority of girls would look like. And, there are published books, I just happened to choose those two because they happened to be in my photo collection but I can assure you, in my experience and in my oath to tell the truth, that is what the majority of girls would look like. The vast majority of girls would not look like what W.C. looks like. She would be, to use my example again, the midget or the dwarf. The person who in everyday life would say, wow, there’s something different and wrong about her.
Now, I acknowledge what he said. I am not certain that she just wasn’t born with her hymen to be a dwarf. I simply recognize that in our classification system, that shortness is associated more frequently with people who have been sexually abused than not. As such, it is an indicator. It is a concerning finding but not a definitive one as I told the prosecutor.
| «EXAMINATION BY MR. BEL-FIELD:
Q. If race was not important, why was it that you chose to bring the photographs of two black girls? If the vagi-nas of eight year old girls are supposedly consistent why not just pick any eight year old girl? Why did you specifically tell the jury that you picked the photographs of black girls? There is nothing funny, doctor. This man’s life—
THE STATE:
Objection, Your Honor, as to—
MR. BELFIELD:
—is on the fine.
THE STATE:
—these comments.
MR. BELFIELD:
He laughing, Your Honor.
THE COURT:
All right, are you ready for your mistrial?
MR. BELFIELD:
Yes, sir.
THE COURT:
All right, mistrial granted. You are in contempt of court, twenty-four hours or $250.00.
Ladies and gentlemen, that ends the case based on Mr. Belfield’s persistence in disregarding the orders of the court that I gave to him this morning. I feel at this point that notwithstanding his behavior, we are not in a position to continue to give Mr. Moran a fair trial. This is in violation of specific orders that apply in every case we apply in Section “G” and that is, that attorneys are not to make legal arguments nor racially motivated arguments to the jury. Those arguments are to be made to me at sidebar.
(Whereupon, jury is thankfully excused) THE COURT:
Mr. Belfield, may I see you up here? MR. BELFIELD:
*1179 May I put something on the record, first?
THE COURT:
No, I want to see you at the sidebar. (BRIEF SIDEBAR DISCUSSION WITHOUT THE RECORD)
THE COURT:
Put all your stuff on the record. Go ahead. I’m listening.
IgMR. BELFIELD:
For the record, Your Honor, during the direct examination of the witness, the witness stated himself that he purposely got the photographs of two black females. If the color — if the race of the person wasn’t important, why did the court allow the doctor to state to the jury that he had gotten the photographs of two black females if the doctor’s proposition that all females are supposedly alike, why would he be allowed to state to the jury that he got the photographs of two African American females and present that to the jury? So, my question to him was, why did you do that, doctor, if that was a reason for a mistrial to ask him a further question—
THE COURT:
Oh, Mr. Belfield, you moved for the mistrial. You moved for the mistrial. You moved for the mistrial. Sheriff, get the jury back.
MR. BELFIELD:
I moved? You asked me if I was ready for a mistrial?
THE COURT:
No, no.
MR. BELFIELD:
I didn’t ask for no mistrial!
THE COURT:
Wait a minute. Lower your voice, Mister. Lower your voice. Lower your voice.
MR. BELFIELD:
Your Honor, I—
THE COURT:
It’s my turn to talk. Lower your voice and listen. When you made that side comment to the jury, you specifically turned to your left, looked at the jury, and said, “all black people look alike.” MR. BELFIELD:
You admonished that—
THE COURT:
Don’t interrupt me! Do not interrupt me and do not turn your back to me. MR. BELFIELD:
Just tell me when I can talk. That’s all I need to know.
THE COURT:
|inWhen you made that comment to the jury, “all black people look alike” I said, “Mr. Belfield, this is your last warning.” You moved for a mistrial.
MR. BELFIELD:
No, sir. That did not happen.
THE COURT:
All right, find it in the record.
MR. BELFIELD:
That did not happen.
THE COURT:
Find it—
MR. BELFIELD:
You—
THE COURT:
Stop talking. Find it in the—
MR. BELFIELD:
I mean, even—
THE COURT:
Mrs. Joseph- — ■
MR. BELFIELD:
I ask for a time to put my record, whatever I go to say on the record. Whenever you allow me to do that then I will begin to talk again and I apologize if I’m out of order.
*1180 THE COURT:
Mrs. Joseph, find in the record where Mr. Belfield made his first motion for a mistrial. When you have located that in your transcription tapes, please let me know and court will reconvene. In the meantime, sheriff, hold the jury.
(Whereupon court stands in recess)
(Reporter locates requested portion of transcript)
THE COURT:
All right, come back to order. Ms. Joseph, I had asked you to find in your notes Mr. Belfield’s motion for a mistrial. Would you read that to the court?
(Whereupon court reporter reads requested portion to the court and attorneys)
THE COURT:
Let the record reflect we have now confirmed through the court stenographer’s notes that Mr. Belfield had, in fact, moved for a mistrial and the court granted that motion. Now, Mr. Belfield, place whatever you would like.
InMR. BELFIELD:
Your Honor, my mistrial at that point in time had to do with your making the comments that you made—
THE COURT:
Telling you to look up at me?
MR. BELFIELD:
And the warning and the admonition that you did of me in front of the jury is what the reason I made that mistrial. Therefore, it had nothing to do with the racial comments by this person.
THE COURT:
Mr. Belfield, your motion is granted. MR. BELFIELD:
I withdraw my motion. I don’t want a mistrial.
THE COURT:
It’s too late now. You’ve moved for the mistrial.
MR. BELFIELD:
You denied my mistrial at that time, Your Honor—
THE COURT:
Okay. Proceed with your record.
MR. BELFIELD:
You denied my mistrial. We were— we had moved on into additional testimony and at some point later you look at me and ask me about a mistrial. Am I ready for a mistrial. I’m assuming at that point it was because the doctor is sitting there laughing at the jury like something is funny. The doctor breaks out in a big laugh like something is funny and you ask me am I ready for my mistrial. The mistrial that you had ruled on previously about me asking for a mistrial, we had passed that. You had denied it and we had moved passed it.
THE COURT:
And when the doctor was laughing and I asked you were you ready for your mistrial, and you said, yes, you were assuming that I thought it was based on the doctor’s laughter, is that correct?
MR. BELFIELD:
That’s exactly correct, Your Honor.
THE COURT:
So, that was the second motion for a mistrial?
MR. BELFIELD:
_jjgWell, I didn’t really want a mistrial. You asked me if I wanted one. I didn’t make a motion for a mistrial. You asked me about a mistrial. You injected the mistrial.
THE COURT:
And what was—
MR. BELFIELD:
I was trying to get — •
THE COURT:
*1181 Mr. Belfield. Mr. Belfield, first of all, lower your voice. I have a great deal of respect for you. I’m not yelling at you and I’m going to have to insist that you show me the same respect that I give to you. What was your response when I said, as you have phrased it, are you ready for your mistrial now? What was your response?
MR. BELFIELD:
(No response)
THE COURT:
Shall we have the court reporter go back and get it out of the record?
MR. BELFIELD:
Your Honor, I want to say two things on the record and I’m going to be quiet. Number one, the volume of my voice has nothing to do with my respect or disrespect for you or for the court. I fully respect you and the court. Just because the volume of my voice happens to go up and down, that has nothing to do with my respect or disrespect.
For the record, I do not want a mistrial. I do not ask for one. I don’t want one. I want to proceed with the jury that we have. For the record, I want it abundantly clear, the mistrial that I asked for earlier that was denied, I’m fine with that. I do not want a mistrial. I would like for you to admonish the doctor that there ain’t nothing funny in here. I’ve got a guy’s life on the line. He’s sitting in front of the jury laughing. This man is facing imprisonment for the rest of his life—
⅜ ⅜ ⅜ ⅜ ⅜
THE COURT:
Allright. I’m not going to make a speech about anything being funny about anything but I will admonish the doctor in front of the jury to refrain from any laughter in connection with his response to your questions. And, I want the record to be abundantly clear, Mr. Belfield, you are withdrawing your motion for a mistrial made earlier, is that correct?
MR. BELFIELD:
|1sI’m withdrawing my motion for a mistrial that was made—
THE COURT:
Whenever it was made, Mr, Belfield, is it withdrawn, yes or no?
MR. BELFIELD:
The first motion for mistrial that I made is withdrawn. Well, not withdrawn, you ruled against it. You overruled me.
THE COURT:
Allright, if that’s what you think the status of the record is, that’s fine. Sheriff, the jury, please.
MR. DEBLANC:
Judge, what about his second motion for a mistrial?
THE COURT:
He’s saying he didn’t make a motion.
MR. DEBLANC:
Well, Judge, if there is one in the record, there has to be a ruling as to it. Otherwise when the transcript gets viewed at the end of this trial, if there is a verdict of guilty, I’m concerned about what motion may still be out there granting a mistrial.
THE COURT:
That motion was granted. I granted both motions for the mistrial. Mr. Bel-field is now instructing the court that he’s withdrawing his motions, he’s denying he made the second motion and I am reversing myself: The motions that were previously granted are now denied. The jury, please, sheriff.
(JURORS ARE ESCORTED TO THE JURY BOX)
*1182 As the trial transcript reveals, the trial court granted the defendant’s second motion for mistrial on the basis of the defense counsel’s behavior. When defense counsel learned that the mistrial was granted on that basis, he withdrew his motion for mistrial. The trial court then reversed itself and requested that the jury return to the courtroom. The transcript and minute entries indicate that the jury was being held in the jury room while the trial court and defense counsel discussed the mistrial. The defendant did not object to the trial court’s ruling or the resumption of trial. As defendant did not object to the resumption of trial (in fact, the defense counsel requested |uthat trial resume), the issue presented in this assignment of error has not been preserved for appeal. La.C.Cr. P. article 841.
This assignment is without merit.
Accordingly, the defendant’s conviction and sentence are affirmed.

CONVICTION AND SENTENCE AFFIRMED.

. Due to the sensitive nature of this case, the victim and her relatives will be referred to by their initials.